IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2014 AUG 13 PM 3: 45
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | |
|---|---|
| JOHN PAUL DEJORIA<br>*Plaintiff/ Counterclaim Def.*<br><br>v.<br><br>MAGHREB PETROLEUM<br>EXPLORATION S.A.;<br>MIDEAST FUND FOR<br>MOROCCO LIMITED, JOHN<br>DOE #1, and JOHN DOE # 2<br>*Def./ Counterclaim Plaintiffs* | CIVIL ACTION NO.<br>1:13-cv-654-JRN |

## ORDER

Before the Court are John Paul DeJoria's ("DeJoria") Motion for

Nonrecognition of Foreign Judgment (Dkt. No. 25); DeJoria's Memorandum

in Support of his Motion for Non-Recognition (Dkt. No. 30); Maghreb

Petroleum Exploration, S.A., Mideast Fund for Morocco Limited's

("MPE/MFM") Response in Opposition to DeJoria's Motion for Non-

Recognition (Dkt. No. 37); and MPE/MFM's Sur-Reply in Opposition to

Motion and in further support of Recognition and Enforcement of the Morocco

Court Judgment. (Dkt. No. 43).

The parties in this case are former partners in a Moroccan oil venture. In 2002, MPE/MFM filed suit in Morocco against seven of its former partners, including DeJoria, alleging that DeJoria and his fellow defendants fraudulently represented the value of their company to induce MPE/MFM to invest in it, as well as alleging that DeJoria and the other named defendants mismanaged the company. On December 31, 2009, a court in Morocco entered judgment in favor of Defendant/ Counterclaim Plaintiffs MPE/MFM and against DeJoria and one other person for an amount approximately equaling approximately $122.9 million.

In the instant case, the parties have, in essence, filed dueling motions for declaratory judgment. DeJoria argues that Texas law mandates non-enforcement of the Moroccan court judgment and requests that the Court therefore grant its motion for non-recognition of the Moroccan Court's judgment. MPE/MFM counters that Texas law supports enforcement of the Moroccan court's judgment and correspondingly requests that the Court enter judgment in favor of MPE/MFM.

For reasons set out in detail below, the Court finds that the Texas Uniform Foreign Country Money Judgments Recognition Act proscribes the Court from enforcing the Moroccan Court's December 2009 judgment against

DeJoria. As such, the Court GRANTS DeJoria's Motion for Non-Recognition. (Dkt. No. 25).

## I.   OVERVIEW/ PROCEDURAL HISTORY

Plaintiff and Counterclaim Defendant is John Paul DeJoria ("DeJoria"). A resident of Austin, DeJoria is an extremely successful entrepreneur who co-founded John Paul Mitchell hair products, the Patron Spirit Company, and the House of Blues nightclub chain. His involvement in this case, however, stems from his relationship with a company called Skidmore Energy. Between 1998 and 2001, DeJoria invested in an American company called Skidmore Energy, Inc. ("Skidmore") in order to fund an oil exploration and technology project that Skidmore was pursuing in Morocco. (Dkt. No. 30, Ex. G).

In order to carry on its business in Morocco, Skidmore formed and capitalized a Moroccan corporation called Lone Star Energy Corporation ("Lone Star") in order to develop energy resources in Morocco.[1]  (Dkt. No. 37, Ex. X-10). The new entity would focus on developing energy resources in Morocco. Under Moroccan law, Moroccan corporations require a "local" partner/shareholder. In Lone Star's case, the local partner/shareholder was

---

[1] Lone Star was subsequently renamed "Magrheb Petroleum Exploration S.A. ("MPE"). MPE is a party in this case seeking enforcement of the Moroccan court's judgment.

Mediholding, S.A., which is owned by Prince Moulay Abdallah Aloaoui of Morocco (King Mohammed VI's first cousin). (Dkt. No. 30, Ex. J-A).

In March of 2000, Lone Star entered into an "Investment Agreement" with the Kingdom of Morocco in which Lone Star agreed to invest in hydrocarbon exploration in Morocco in return for obtaining mineral rights concessions and other benefits from Morocco. In that agreement, Lone Star agreed to drill at least three exploration wells in Morocco and invest roughly $150 million to explore hydrocarbons in Morocco. (Dkt. No. 6, Ex. 1).

On June 20, 2000, DeJoria and his business partner, Michael Gustin, attended a White House dinner honoring King Mohammed VI. Less than a month later, on July 8, 2000, DeJoria traveled to Morocco and personally met with King Mohammed VI, Prince Moulay Alaoui, and Mohammed Benslimane (brother-in-law of Prince Moulay Hicham). (Dkt. No. 30, Ex. J-A). At the meeting, the men discussed the need for Lone Star to secure more funding to support its rapidly expanding drilling projects. (*Id.*, Ex. G at ¶ 3). At that meeting, DeJoria claims that the King assured him that he would line up investors for Lone Star and that funding would not be an issue for the company going forward. (*Id.*).

4

Sure enough, in early August of 2000, a Lichtenstein based company called Armadillo Holdings[2] approached Lone Star and expressed an interest in investing in the company. During the negotiations the followed, Skidmore represented to the potential investors that it had (up until that point) invested roughly $27.5 million in Lone Star. (Dkt. No. 6, Ex. 1). Skidmore also estimated that Lone Star's conservative market value was around $175.75 million. (*Id.*). Based on these representations, Armadillo/MFM agreed to invest $13.5 million in Lone Star in exchange for 50% of Skidmore shares and 50% of "all assets, including exploration licenses, technology licenses, SBK#1 well and lease, all inventories and supplies, etc." (*Id.*).

On August 20, 2000, King Mohammed gave a nationally televised speech during which he announced the discovery of what he described as "copious and high quality oil" in Morocco. (Dkt. No. 30, Ex. I.3). Three days later, on August 23, 2000, the then Moroccan energy minister, Yousesef Tahiri, traveled to the site of the "discovery" and—with DeJoria and Gustin at his side—held a press conference during which he exclaimed that the oil discovery was such that it was expected to yield enough oil to supply the Kingdom for roughly 30 years. (*Id.*).

---

[2] Armadillo Holdings has since been re-named Mideast Fund for Morocco ("MFM").

The King's announcement was huge news in Morocco. Located on the northwestern tip of the African continent, the Kingdom of Morocco sits next to some of Africa's largest oil and gas producing nations. Yet while its neighbors on the African coast have emerged as major producers of energy, Morocco has not discovered a reliable domestic source of oil and gas. As a result, the country imports about 95 percent of its energy needs, leaving the nation vulnerable to the ebbs and flows of the international energy markets. The King's remarks seemed to presage the end of Morocco's longstanding energy insecurity, a prospect that so excited Moroccan traders that the Moroccan stock market jumped 5% following the King's announcement. (*Id.*).

There was only one problem. There was no oil—or not very much of it, anyway. In the end, Morocco's natural resources proved to be less plentiful than the King suggested, a reality which adversely affected both the King's credibility and Lone Star's long term business prospects. (*Id.*, Ex. I-8). By the summer of 2001, it had become clear that Lone Star would require an infusion of additional capital in order to stay afloat.

This turn of events led the partnership between MFM and Skidmore to break down. MFM and its partners became convinced that Gustin and DeJoria were culpable for the problems at Lone Star. Meanwhile, both DeJoria and Gustin fled Morocco for good. DeJoria claims that he and

6

Gustin's lives would have been in danger had either stayed in or traveled to Morocco. (*Id.*, Ex. G at ¶¶ 6-7). MFM attributes DeJoria and Gustin's absence to a conscious decision to flee the jurisdiction in order to avoid having to answer for Skidmore's fraudulent representations.

Whatever actually motivated the men to get out of Dodge, neither DeJoria nor Gustin attended the May 2001 meeting of Lone Star's Board of Directors in Morocco. (*Id.*, Ex. J). During that meeting, the Board voted to remove Gustin as its Chairman. (*Id.*, Ex. J-B). Two months later, during the July 2001 Lone Star Board meeting, Lone Star's Board finalized plans to re-capitalize the company with an additional $15.9 million in funds. (Dkt. No. 6, Ex. 1 at 6.). At the same meeting, the Board voted to remove both DeJoria and Gustin as Directors. [3] (*Id.*).

Legal fireworks ensued. Displeased that their investment in Lone Star had not yielded the returns that it had expected when it entered into the Memorandum of Understanding ("MOU") with Skidmore, MFM brought suit against Skidmore, as well as a number of its officers in their individual capacities (DeJoria included), in Moroccan court. The Plaintiffs in that lawsuit made a plethora of allegations, namely that Dejoria and his partner

---

[3] Somewhat bizarrely given all of the things DeJoria and Gustin are alleged to have done to Armadillo, MPE/MFM report that Skidmore was nevertheless invited to participate in the recapitalization of the company. (Dkt. No. 6, Ex. 1 at 11).

had mismanaged the company and lied during negotiations. Specifically, MFM argued that Skidmore fraudulently induced it into investing in Skidmore by misrepresenting the true extent of Skidmore's investment in Lone Star.[4] (Dkt. No. 6, Ex. 1). According to the Plaintiffs in the suit, Skidmore's fraudulent representations deprived Lone Star of the capital the company needed to fund ongoing business operations, thereby forcing the company to obtain an additional $15.9 million in emergency funding from MFM and others to fill the funding void that existed as a result of Skidmore's failure to live up to the promises it made in the MOU. (*Id.*).

Skidmore, for its part,  responded to the breakdown in relations by filing two obviously frivolous lawsuits against MPE, MFM, and scores of other tangentially related parties in the United States, each of which was dismissed in short order.[5]

---

[4] MFM alleged that at the time that Skidmore represented that it had invested $27.5 million when in fact it had in fact only invested $3,708,812.49. (Dkt. No. 6, Ex. 1).

[5]      In its first suit, *Skidmore Energy, Inc. and Geoscience Int'l, Inc. v. KPMG et al,* Case No. 3:03-cv-02128-B (N.D. TX Sept. 19, 2003), Skidmore and Geoscience sought  $3 billion in damages from MPE, MFM, KPMG, and 18 other individuals and entities for anti-trust and RICO violations, breach of contract, fraud, and aiding and abetting breach of fiduciary duty. US District Judge Boyle found that the lawsuit against MPE, MFM, and nine other defendants was "factually and legally groundless" and cited a "puzzling lack of legal or factual support" for the allegations included in Skidmore's pleadings. *Skidmore Energy, Inc. and Geoscience Int'l, Inc. v. KPMG et al,* Case No. 3:03-cv-02128-B (N.D. TX Mar. 17, 2005 and May 18, 2005). The district court subsequently awarded $530,667.32 in sanctions against Skidmore, Geoscience, and their lawyer Gary Sullivan.

The subject of this Court's analysis *in this case* is the outcome of MPE's suit against Skidmore in Morocco. On December 31, 2009, after nearly seven years of considering the case, a Moroccan court entered judgment in favor of MPE and MFM and against DeJoria and Gustin in the amount of 969,832,062.22 Moroccan Dirhams, or approximately $122.9 million. (Dkt. No. 6, Ex. 1 at p. 18).

The only question before this Court is whether or not the Moroccan court's $122.9 judgment against DeJoria is enforceable in the United States.

## II.   APPLICABLE LAW

There is no federal statute or common law applicable to the recognition of foreign judgments. *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1212 (9th Cir. 2006) (en banc). In diversity cases, the law of the state in which the federal court sits governs recognition of foreign judgments. *Id.* at 1213; *British Midland Airways Ltd. v. Int'l Travel, Inc.*, 497 F.2d 869, 871 n.2 (9th Cir. 1974).

---

Unfazed by Judge Boyle's decision, Skidmore filed a virtually identical action in federal district court in California (only it named fewer defendants). *See Skidmore Energy, Inc. v. Mediholdings S.A. et al.*, Case No. 2:05-cv-04742 (C.D. Cal. June 29, 2005). Not surprisingly, the case did not fare any better than Skidmore's previous effort (unless one counts not being assessed over a half a million dollars in court costs and sanctions an improvement, which the Court supposes it is). On October 24, 2007, the district court granted MPE and other defendant's motions to dismiss. *Id.* The US Court of Appeals for the Ninth Circuit subsequently affirmed the district court in *Skidmore Energy Inc.v. Maghreb Petroleum S.A.*, 337 Fed. Appx. 706, 707 (9th Cir. July 16, 2009).

The Uniform Foreign Country Money-Judgment Recognition Act has been adopted by Texas and governs whether a judgment entered by a foreign nation will be recognized in this country. Tex. Civ. Prac. & Rem.Code Ann. §§ 36.001-36.008 (Vernon 2000).

Under this Act, once a copy of a foreign judgment is filed with the clerk of the court in the county of residence of the party against whom recognition is sought, the party against whom recognition is sought may contest the judgment's recognition by filing a motion for non-recognition. *Id.* §§ 36.0041, 36.0044.

The Texas Recognition Act provides that a foreign country judgment is enforceable in the same manner as a judgment of a sister state that is entitled to full faith and credit." *Id.* § 36.004. Accordingly, the Texas Recognition Act presumes recognition and mandates enforcement unless the opposing party proves to the Court that it cannot or should not enforce the judgment. *Dart v. Balaam,* 953 S.W.2d 478, 480 (Tex.App.—Fort Worth 1997, no writ) (noting that "[t]he party seeking to avoid recognition has the burden of proving a ground for nonrecognition").

§36.005(a) sets the circumstances under which a court cannot enforce a foreign money judgment:

(1) the judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law;

(2) the foreign country or court did not have personal jurisdiction over the defendant; or

(3) the foreign country court did not have jurisdiction over the subject matter.

Per the dictates of §36.005(b), the Court may also decide not to enforce a foreign judgment if:

(1) the defendant in the proceedings in the country did not receive notice of the proceedings in sufficient time to defend;

(2) the judgment was obtained by fraud;

(3) the cause of action on which the judgment is based is repugnant to the public policy of the state of Texas;

(4) the judgment conflicts with another final and conclusive judgment;

(5) the proceedings in the foreign country court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceeding in that court;

(6) in the case of jurisdiction based only on personal service, the foreign country court was a seriously inconvenient forum for the trial of the action; or

(7) it is established that the foreign country in which the judgment was rendered does not recognize judgments rendered in this state that, but for the fact that they are rendered in this state, conform to the definition of "foreign money judgment."

*Tex. Civ. Prac. & Rem. Code Ann. § 36.005* (West 1998).

Applying the Texas Act is neither purely a question of law nor purely a question of fact. Instead, "it is a question about the law of a foreign nation, and in answering such questions a federal court is not limited to the consideration of evidence that would be admissible under the Federal Rules of Evidence; any relevant material or source may be consulted." Fed.R.Civ.P. 44.1; *Pittway Corp. v. United States*, 88 F.3d 501, 504 (7th Cir.1996); 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2446 (1995).

## III.   DISCUSSION

In his briefs, DeJoria argues that the Court is barred from enforcing the judgment since, he claims, the judgment against DeJoria violates mandatory grounds §36.005(a)(1) and (a)(2). DeJoria additionally challenges recognition under discretionary grounds 36.005(b)(3), (b)(6), and (b)(7). MPE/MFM counter on all points and assert that the Court should recognize the Moroccan Court's judgment.

The Court need not address DeJoria's arguments for discretionary non-recognition if it finds that DeJoria has met his burden and proved either that Moroccan tribunals do not afford sufficient due process or that the Moroccan trial court never obtained personal jurisdiction over him. DeJoria's prevailing on either point suffices to bind the Court's hands and forces non-recognition. Thus the Court will begin (and, as it turns out, end) its analysis with DeJoria's argument that the Moroccan court did not provide him with adequate due process to warrant recognition under the Texas Act.

A. <u>The Moroccan Court Judgment Was Not Rendered Under a System that Provides Impartial Tribunals and Procedures Compatible with Due Process.</u>

A foreign judgment cannot be recognized in Texas if it was "rendered under a system which does not provide ... procedures compatible with the

requirements of due process of law." Tex. Civ. Prac. & Rem.Code § 36.005(a)(1). The term "due process" in this context does not refer to the "latest twist and turn of our courts" regarding procedural due process norms, because it is not "intended to reflect the idiosyncratic jurisprudence of a particular state." *Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 476-77 (7th Cir. 2000) (interpreting an identical provision of the Uniform Foreign Money–Judgments Recognition Act under Illinois law). Instead, "this provision has been interpreted...to mean that the foreign procedures [must only be] 'fundamentally fair' and ... not offend against 'basic fairness.'" *Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 330 (5th Cir. 2002) (quoting *Ashenden*, 233 F.3d at 477); 18B Charles Alan Wright et al., *Federal Practice and Procedure* § 4473 n. 7 (2d ed.2002) (quoting *Ashenden*, 233 F.3d at 477).

The "international due process standard" first described by Judge Posner in *Ashenden* sets a very low bar for enforcement. *Ashenden*, 233 F.3d at 477. The virtue of this construction—and one of the reasons that so many courts have adopted the standard—is that any country that has a history of commitment to the rule of law will pass the test. Given this fact, it is not surprising that the vast majority of courts faced with claims that a foreign court system did not provide adequate due process to warrant enforcement

have found that the issuing court in fact provided sufficient due process to justify recognition.

Yet, from time to time, judgments are rendered against Americans in countries "whose adherence to the rule of law and commitment to the norm of due process are open to serious question." *Id.* Where there is evidence that a country's judiciary is dominated by the political branch of government or by an opposing litigant, or where a party cannot obtain counsel, secure documents, or secure a fair appeal, recognition of a foreign judgment may not be appropriate. *See, e.g., Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1411–12 (9th Cir.1995); *Choi v. Kim,* 50 F.3d 244, 249–50 (3d Cir.1995); *Banco Minero v. Ross, supra,* 172 S.W. at 715; *Bridgeway Corp. v. Citibank,* 45 F.Supp.2d 276, 286–88 (S.D.N.Y.1999); *see also* Restatement (Third) of Foreign Relations Law of United States § 482, comment b (1987).

A close examination of Morocco's legal system reveals structural and practical issues that are not present in countries like England, France, or South Korea. While Morocco has made serious strides in many areas and appears to have a populous genuinely desirous of and committed to establishing a societal framework founded upon the rule of law, the Moroccan royal family's commitment to the sort of independent judiciary necessary to uphold the rule of law has and continues to be lacking in ways that raise

serious questions about whether any party that finds itself involved in a legal dispute in which the royal family has an apparent interest—be it economic or political—in the outcome of the case could ever receive a fair trial.

### i. Moroccan Judges Are Not Independent And Are Susceptible To Being Pressured By Members Of The Royal Family.

In September of 2010, USAID released its "Morocco Rule of Law Report." [6] (Dkt. No. 30, Ex. H.2). Spanning a total of 66 pages, the report touches on a broad array of topics including many that are directly relevant to the Court's inquiry in this case.

Right off the bat, the authors of the report paints a bleak picture of the state of the rule of law generally, and the functioning of the judicial system specifically, in Morocco. In the last sentence of the very first paragraph of the report's Executive Summary, the authors observe that among Moroccan citizens, "there is a widely held perception that corruption is tolerated, that a

---

[6] "The assessment took place in two phases with an initial assessment in October 2008, followed by an additional in-country visit in November 2009. The assessment teams conducted documentary reviews; interviews with governmental officials, private sector and civil society representatives, and other international donors; and targeted group meetings. Based on an analysis of this information the teams developed an assessment of the status of rule of law in Morocco and provided recommendations for a strategic approach to future rule of law programming." (Dkt. No. 30, Ex. H.2). The Court adds that the investigations took place simultaneously with the proceedings in Morocco and are therefore directly relevant to the reliability of the Moroccan legal system that gave rise to the judgment at issue in this case.

political and security elite act with impunity, and that strong actions are taken against those who would challenge power." (*Id.* at ii).

Before launching into the body of the report, though, the authors provide the reader with seven bullet points intended to broadly describe their findings. The first bullet point reads: "**Judicial independence is lacking due to a number of factors, including deficiencies in both law and practice...[t]he roles of the Ministry of Justice (MOJ) and the King further complicate this issue.**" (Emphasis in original). (*Id.*). The last bullet point is equally ominous. It simply states: "Corruption is one of the most significant challenges confronting Morocco." (*Id.*).

The USAID report's findings with respect to the Moroccan judiciary— especially those related to the subject of judicial independence—are particularly relevant to the Court's inquiry in this case. The authors describe the current judicial system as "permeable to political influence" and go on to explain that "the mechanisms through which judges are appointed, promoted, sanctioned, and dismissed leave them [Moroccan judges] vulnerable to political retribution." (*Id.* at 12). As a result, "the judiciary still suffers from persistent complaints that it is plagued with corruption, is not independent or accountable, does not have effective mechanisms for enforcement, and is encumbered by delays." (*Id.* at 12).

The judiciary's struggle to remain independent is in part a result of structural factors. While the 1996 Constitution guarantees judicial independence, the judiciary remains under the administrative control of the Ministry of Justice, which of course answers directly to the King. (*Id.*). Moreover, the Constitution does not establish the judiciary as an autonomous entity. (*Id.*).

That the judiciary is not structurally insulated from the other political branches of government is unremarkable, at least in the context of other international judicial systems. In fact, the Moroccan Constitution's language relating to the judiciary is modeled on France's Constitution. Unfortunately, members of Morocco's judiciary must also contend with forces that do not exist in France. Specifically, "[j]udicial independence [in Morocco] is further complicated by the King's role." (*Id.*). Not only are all judgments rendered by Moroccan courts issued in the name of the King, but the King also presides over the Conseil Supérieur de la Magistrature (High Judicial Council), which is the body that appoints, disciplines, and promotes judges. (*Id.*).

Additionally, per Article 24 of the Moroccan Constitution, the King appoints the Minister of Justice. (*Id.*). Given that the MOJ sits on the High Judicial Council, this gives the King considerable indirect influence over the makeup of the judiciary since "[t]he MOJ exercises significant influence over

the appointment, discipline, transfer, and promotion of judges." (*Id.*). This fact "makes judges beholden to the MOJ not only for their initial appointment but for their continued job security as well, with obvious negative implications for judicial independence." (*Id.*).

MPE/MFM argue that the USAID report overstates the severity of the problems afflicting the Moroccan legal system. They cite various reports which detail the exceedingly modest steps that the King has implemented in recent years to combat corruption. Yet this evidence does little to persuade the Court that the Moroccan legal system's most troubling flaws are a thing of the past. Indeed, in March of 2011—*two years after the Moroccan Court issued its judgment against DeJoria*—Morocco's very own Foreign Minister all but confirmed the veracity of the USAID report's findings pertaining to judicial independence in Morocco. Speaking to an audience at the Brookings Institute in Washington DC, Foreign Minister Taieb Fassi-Fihri, described Morocco's continuing problem with "phone call justice." Judicial independence, he explained, "is not the reality today, because (there are) some calls from time to time, from the Justice Department to some judge." (*Id.*, Ex. H.22; a complete transcript of the Foreign Minister's remarks are available                                                                    at

http://www.brookings.edu/~/media/events/2011/3/23%20morocco/032311_mor

occo_transcript.pdf).

Together, the USAID report and the foreign minister's comments paint a picture of a judicial system in which judges feel tremendous pressure to render judgments that comply with the wishes of the royal family and those closely affiliated with it. Yet perhaps the most powerful piece of evidence that all is not well in the Moroccan judicial system came from the Moroccan judges themselves. On October 6, 2012, roughly 1,000 Moroccan judges staged a sit-in in front of the Moroccan Supreme Court demanding more independence for the judiciary. (Dkt. No. 30, Ex. H.23). With them, the protesting judges carried a petition signed by 2,200 Moroccan judges—*roughly 2/3rds of the country's total judges*—demanding structural reforms to guarantee their independence from the King. (*Id.*). The gesture speaks for itself,  but it is worth noting that every judge that signed the aforementioned petition did so knowing that by publicly opposing the King, they were opening themselves to precisely the kinds of retribution discussed by the USAID report.

ii. The King's Actions In 2007 Reveal That The King Actively Sought To Shape The Public's Perception Of His (And Dejoria's) Role In The Talisint Oil Project Through Intimidation.

MPE/MFM do not dispute the fact that the King *could* intervene in the legal process if he wishes to do so. They do not deny that Skidmore played an important role in the process that ultimately lead the King to give his ill fated speech announcing the existence of large, exploitable oil reserves in Morocco. They do not dispute that the Prince of Morocco himself received shares (however small the interest) in the company Skidmore created in Morocco for the purpose of facilitating its aims and objectives there. MPE/MFM do not even quibble with the assertion that DeJoria had personal contact with members of the royal family, including the King himself, in advance to the creation of the partnership between the Moroccans and Skidmore, or. Nevertheless, MPE/MFM argue that the Court need not worry about these factors since DeJoria's case simply did not matter enough to the King or royal family to warrant genuine concern that the royal family would corrupt the process. After all, MPE/MFM note, the Prince's financial stake in MPE was too small to matter. Moreover, according to MPE/MFM, there is no evidence that "the King or anyone else in Morocco these days cares about [DeJoria] at all or even remembers who he is or the bad acts he perpetrated." (Dkt. No. 37 at p. 25).

As a general matter, MPE/MFM's suggestion that the circumstances surrounding the case do not warrant real concerns that the King or royal family corrupted the judicial proceedings is simply not credible. For one, the Prince's "insignificant" financial interest (MPE/MFM claim that the Prince owns 0.00026% of MPE) is not insignificant at all. Even assuming that MPE would only receive 50% of the settlement award of $122.9 million, the value of the Prince's ownership interest in the company would be boosted by at least $15,977.[7] Given that the Prince appears to have paid zero consideration in return for his ownership interest in Armadillo (now MPE), such an award would represent quite a nice windfall.

As for MPE/MFM's suggestion that there is no evidence that the King particularly cared about DeJoria or his role in the Talsint oil project, the evidence plainly suggests otherwise.

On Monday, January 27, 2007, "Le Journal," a Moroccan daily newspaper, ran a feature story under the headline "The Talsint Oil Lie." (Dkt. No. 30, Ex. I.1-I.2). Citing a letter sent by Skidmore Chairman (and DeJoria partner) Michael Gustin to the King and other top officials, the article "accused the King and some officials of bribery and disinformation" in regards to Skidmore's exploration and attempted production of oil in south

---

[7] (0.00026 x 122.9 million)/2=15,977.

eastern Morocco in 2000.[8] (*Id.,* Ex. I.2). Neither the story nor the paper would survive for very long. The next day, Le Journal suddenly retracted the story, stating (without any meaningful explanation) that everything they had published was untrue. (Dkt. No. 30, Ex. I.1-I.2). The paper also announced—again without any explanation—that it would voluntarily go out of circulation for an undisclosed period of time. (*Id,* Ex. I.1).  Two days later, a sister publication reported that the author of the "offensive" Le Journal article (who also served as Le Journal's editor-in-chief) and Le Journal's publisher were both compelled to appear at the Justice Center so that they could be interrogated by criminal prosecutors about their involvement with the story. (*Id.,* Ex. I.1).

Unsurprisingly, it appears that the above series of events was not an aberration. The King has a history of suspending (and punishing) publications that displease him. Indeed, when Le Journal resumed publishing, it was not the only news publication that was re-emerging after a

---

[8] Asked about the Le Journal story, Abdulomoneim Delmy—the chairman of the Moroccan Federation of Newspaper Publishers and publisher of two daily newspapers—remarked that Le Journal had "breach[ed] the ethics and applicable laws of Morocco." (Dkt. No. 30, Ex. I.1). Mr. Delmy proceeded to profess his professional allegiance to the King:"we [Moroccan newspaper publishers/editors]...have a basic reference being the charter of the profession's ethics that was adopted by the Confederation which provides 'the due respect owed to the President of the State, his majesty the King, who is the Emir of the Believers at the same time.'" Somewhere, Ben Bradlee just threw up.

lengthy suspension. Shortly after Le Journal returned to print, so too did a magazine called Nishan. (*Id.,* Ex. I.2). Nishan was reportedly suspended from circulation for a period of two months by a Moroccan court for "publishing jests that were deemed offensive to King Mohammed VI and Islam." (*Id.*). The article also noted that the editor of the offending issue of Nishan, along with another former member of the magazine's editorial board, was sentenced by a Moroccan judge to *three years prison with probation,* along with a $9,500.00 fine, for his role in "offending the King." (*Id.*).

The King may or may not have disliked DeJoria personally, but the lengths his government went to silence and punish Le Journal for suggesting, in public, that the King's involvement and sponsorship of the Talsint oil project may not have been completely aboveboard certainly suggests that the King cared a great deal about how his involvement in the project was presented to the public. Moreover, the government's response revealed that the King's government was willing to intimidate and retaliate in order to protect that public image.

Consider now the lawsuit against DeJoria and his partners. Lawsuits are legal vehicles for apportioning blame. Lawsuits also tell stories. In the underlying lawsuit, the Moroccans accused DeJoria and his partners of being fraudsters. The implication of that allegation, if true, is that DeJoria and his

partners lied to their partners and mismanaged the company. Yet the inverse is also true: the implication of a finding absolving DeJoria and his partners of any liability would suggest that DeJoria and his partners had dealt fairly with the Moroccans...and that they were all equally responsible for the failure of the project. Given the narrative power that the verdict would undoubtedly have, MPE/MFM's suggestion that a man who cared enough about maintaining his image to intimidate and prosecute a whole paper into submission had no interest in the outcome of a case which could either re-enforce his favored image or, alternatively, make him appear foolish if not downright dishonest for having promised so much oil during his now infamous speech.

These facts would have been readily apparent to any judge presiding over this case. Given the King's history of retaliation, not only against judges who displease him but against anyone who threatens his narrative relating to his involvement in Talsint, the Court cannot conceive of any set of circumstances in which the presiding judge in the underlying case would not have felt tremendous pressure to side with MPE/MFM. The Prince had an economic interest. The King's behavior suggests a strong preference that DeJoria be portrayed as a fraudster who misled the King (since, if DeJoria did not, the King appears dishonest, incompetent, or both in retrospect).

Whether or not the King, Prince, or some other official picked up the phone and ordered the judge to find against DeJoria is, in some sense, beside the point. Even if no such phone call was ever made, the Court nevertheless cannot, in good conscience, conclude that Morocco provided Mr. DeJoria with adequate due process to warrant enforcement in this country.

Judges are not stupid people oblivious to outside pressures. As evidenced by the mass judicial protests, Moroccan judges are keenly aware that their livelihoods (present and future) depend on remaining in the good graces of the King and the royal family. Given this fact, along with the circumstances outlined at length surrounding this case, the likelihood that DeJoria could have or did receive a fair hearing in which the outcome was not pre-ordained is too minimal to permit the Court to overlook the serious issues with both the system and the application present in this case.

### iii.   Existing Case Law Supports Non-Recognition In This Case.

While it is true that few courts have declined enforcement of a foreign judgment on due process grounds, this case presents precisely the types of issues that courts have found sufficient to justify non-enforcement of a foreign money judgment on due process grounds. As previously noted, courts have declined to enforce foreign judgments in instances in which the evidence demonstrated that a country's judiciary is dominated by the political branch

of government or by an opposing litigant, as well as when a party cannot obtain counsel, secure documents, or secure a fair appeal. *See, e.g., Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1411–12 (9th Cir.1995); *Choi v. Kim*, 50 F.3d 244, 249–50 (3d Cir.1995); *Banco Minero v. Ross, supra*, 172 S.W. at 715; *Bridgeway Corp. v. Citibank*, 45 F.Supp.2d 276, 286–88 (S.D.N.Y.1999); *see also* Restatement (Third) of Foreign Relations Law of United States § 482, comment b (1987).

Here, there is extensive evidence suggesting that Morocco's judiciary is dominated by the royal family (through no fault of the judiciary, which would prefer to be left alone to do its job). Additionally, the evidence plainly shows that members of the royal family had a political and economic interest in the outcome of the underlying case. This is a deadly combination, for the confluence of circumstances makes it highly likely that the royal family impacted the judicial oversight of a proceeding in which they themselves had an interest.

Of the few cases in which courts have declined to enforce a judgment on due process grounds, *Bank Melli Iran v. Pahlavi* is the most applicable to this case. 58 F.3d 1406. In that case, the district court refused to enforce a judgment entered by an Iranian court against the sister of the recently deposed Shah after the 1980 revolution, and the US Court of Appeals for the

9th Circuit affirmed. While the Shah's sister did not present any declaration which specifically stated that she would be treated badly by the regime, the court nevertheless concluded that "a common sense reading of the evidence indicates...that she could not possibly have obtained a fair hearing before the courts of Iran had she attempted to fight the Banks' claims against her." *Id.* at 1412.

While this case presents less extreme circumstances (no American probably could have received a fair hearing in Iran at that time, much less the sister of the widely reviled Shah), the Court nevertheless believes that "a common sense reading of the evidence" in this case unequivocally supports the conclusion that John Paul DeJoria could not have expected to obtain a fair hearing in Morocco had he attempted to fight the charges against him. While the evidence plainly suggests that Morocco's judges wish to obtain the freedom from pressure necessary to impartially conduct the business of the court system, the evidence also reveals that any judge presiding over DeJoria's case would have had to ignore either an explicit or implicit threat to his career—if not to his safety and well-being—in order to find against MPE/MFM. Perhaps the evidence did not ever present the judge with this hard choice, but the Court's job is not to determine whether the judge in the underlying case reached the right decision. Instead, the Court is tasked with

deciding whether, based on the evidence, DeJoria or some similarly situated party could have received adequately fair procedures to warrant enforcement. The answer to this question is no. Absent an act of tremendous bravery by the judge, there is no conceivable set of facts or circumstances in which DeJoria could have prevailed in the underlying case. Such a proceeding is not, was not, and can never be "fundamentally fair."

## IV.   CONCLUSION

For reasons set out above, the Court GRANTS John Paul DeJoria's Motion for Non-Recognition. (Dkt. No. 25).

**SIGNED this 12th day of August, 2014.**

JAMES R. NOWLIN
UNITED STATES DISTRICT JUDGE