**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **JOHN PAUL DEJORIA** | § | |
| | § | |
| **V.** | § | **A-13-CV-654-RP-AWA** |
| | § | |
| **MAGHREB PETROLEUM** | § | |
| **EXPLORATION, S.A. and** | § | |
| **MIDEAST FUND FOR** | § | |
| **MOROCCO LIMITED** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:     THE HONORABLE ROBERT PITMAN
         UNITED STATES DISTRICT JUDGE

Before the Court are: John Paul DeJoria's Motion For Non-Recognition (Dkt. No. 128);

MPE's and MFM's Response to DeJoria's Motion for Non-Recognition (Dkt. No. 129); Reply in

Support of John Paul DeJoria's Motion for Non-Recognition (Dkt. No. 130); MPE/MFM's Sur-reply

(Dkt. No. 133);[1] and Brief of the State of Texas as Amicus Curiae in Support of Counterclaim

Defendant John Paul DeJoria (Dkt. No. 135).

The District Court referred the above-matter to the undersigned Magistrate Judge for a report

and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.

## I.  FACTUAL BACKGROUND

As summarized by the Court of Appeals for the Fifth Circuit, the factual background of this

case is as follows:

> John Paul DeJoria ("DeJoria") was a major investor in an American company called
> Skidmore Energy, Inc. ("Skidmore"), which was engaged in oil exploration and

---

[1]The Court has reconsidered its previous ruling denying MPE/MFM leave to file a sur-reply
and now **GRANTS** the Motion for Leave to File a Sur-Reply (Dkt. No. 133).  Thus, the Court has
considered the arguments contained in the Sur-Reply.

technology projects in Morocco. In pursuit of its goals, Skidmore formed and capitalized a Moroccan corporation, Lone Star Energy Corporation ("Lone Star") (now Maghreb Petroleum Exploration, S.A., or "MPE"). Corporations established under Moroccan law are required to have a "local" shareholder. For Lone Star, that local shareholder was Mediholding, S.A., owned by Prince Moulay Abdallah Alaoui, a first cousin of the Moroccan King, King Mohammed VI.

In March 2000, Lone Star entered into an "Investment Agreement" obligating it to invest in hydrocarbon exploration in Morocco. King Mohammed assured DeJoria that he would line up additional investors for the project to ensure adequate funding. Armadillo Holdings ("Armadillo") (now Mideast Fund for Morocco, or "MFM"), a Liechtenstein-based company, agreed to make significant investments in Lone Star. In the negotiations leading up to this agreement, Skidmore represented to Armadillo that Skidmore previously invested $27.5 million in Lone Star and that Lone Star's market value was roughly $175.75 million.

On August 20, 2000, King Mohammed gave a nationally televised speech to announce the discovery of "copious and high-quality oil" in Morocco. Three days later, then-Moroccan Minister of Energy Youssef Tahiri, accompanied by DeJoria and DeJoria's business partner Michael Gustin, traveled to the site and held a press conference claiming that the discovered oil reserves would fulfill Morocco's energy needs for decades. Moroccans celebrated this significant news, as the King's announcement was the only stimulus likely to revive Morocco's sluggish economy. The Moroccan stock market soared.

There was one major problem: the oil reserves were not as plentiful as announced. The "rosy picture" of Moroccan energy independence did not materialize, damaging both the Moroccan government's credibility and Lone Star's viability. As a result, the business relationship between MFM and Skidmore/DeJoria suffered. Lone Star replaced DeJoria and Gustin on Lone Star's Board of Directors. DeJoria has not been to Morocco since 2000 and claims that his life would have been endangered had he returned.

Unhappy with the return on its initial investment in Lone Star, MFM sued Skidmore, DeJoria, Gustin, and a number of other Skidmore officers in their individual capacities in Moroccan court. MFM asserted that Skidmore fraudulently induced its investment by misrepresenting Skidmore's actual investment in Lone Star. MPE later joined as a plaintiff in the suit and claimed that Skidmore's fraudulent misrepresentations deprived Lone Star of necessary capital. In response, Skidmore filed two quickly-dismissed lawsuits against MPE, MFM, and other parties in the United States.

After nearly seven years of considering MPE and MFM's suit, the Moroccan court ruled against DeJoria and Gustin but absolved five of their co-defendants—including Skidmore—of liability. The court entered judgment in favor of MPE and MFM for approximately $122.9 million.

*Dejoria v. Maghreb Petroleum Exploration, S.A.*, 804 F.3d 373, 384 (5th Cir. 2015), *cert. denied*,

136 S.Ct. 2486 (2016).

## II. PROCEDURAL BACKGROUND

### A. Original District Court Proceedings

After the Moroccan court entered the $122.9 million judgment against DeJoria, he sued MPE and MFM in Texas state court, challenging recognition of the judgment under the previous version of Texas's Uniform Foreign Country Money-Judgment Recognition Act (hereinafter the "1981 Texas Recognition Act").[2] MPE/MFM removed the action to federal district court based on diversity of citizenship and the case was assigned to United States District Judge James R. Nowlin. Dejoria then filed a "Motion for Nonrecognition of Foreign Judgment" in the District Court arguing that the Moroccan judgment should not be recognized under the 1981 Texas Recognition Act because: (1) the judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law; (2) the Moroccan court lacked personal jurisdiction over DeJoria; (3) the cause of action on which the judgment is based is repugnant to the public policy of Texas; (4) the court rendering the judgment is a seriously inconvenient forum for the trial of the action; (5) Moroccan courts do not recognize Texas judgments; (6) the judgment was not final and conclusive; and (7) the judgment was not authenticated.

---

[2]Act of May 15, 1981, 67th Leg., R.S., ch. 808, § 1 (codified at TEX. CIV. PRAC. & REM. CODE §§ 36.001, et seq.) (amended 2017; current version at TEX. CIV. PRAC. & REM. CODE §36A.001, et seq.).

The District Court began and ended its analysis with DeJoria's first argument, finding that the Moroccan Judgment should not be recognized under § 36.005(a)(1) of the 1981 Texas Recognition Act ("the judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law"). *DeJoria v. Maghreb Petroleum Exploration*, *S.A.*, 38 F. Supp.3d 805 (W.D. Tex. 2014), *rev'd and remanded*, 804 F.3d 373 (5th Cir. 2015). The District Court found that Moroccan judges are not independent and are susceptible to being pressured by members of the Moroccan royal family, finding that

> the Moroccan royal family's commitment to the sort of independent judiciary necessary to uphold the rule of law has and continues to be lacking in ways that raise serious questions about whether any party that finds itself involved in a legal dispute in which the royal family has an apparent interest—be it economic or political—in the outcome of the case could ever receive a fair trial.

*Id.* at 812. Based on the evidence before it, the District Court held that "DeJoria or some similarly situated party" could not have received adequately fair procedures to warrant enforcement of the Moroccan judgment. *Id.* at 818. The District Court concluded, "[a]bsent an act of tremendous bravery by the judge, there is no conceivable set of facts or circumstances in which DeJoria could have prevailed in the underlying case. Such a proceeding is not, was not, and can never be 'fundamentally fair.'" *Id.*

## B.    The Fifth Circuit's Opinion

MPE/MFM appealed the District Court's ruling to the Court of Appeals for the Fifth Circuit, arguing that the judgment should be reversed because DeJoria had failed to meet his burden to prove that the entire Moroccan judicial system does not meet due process standards as required under § 36.005(a)(1) of the 1981 Texas Recognition Act. The Fifth Circuit agreed and held that DeJoria had failed to meet his heavy burden under § 36.005(a)(1) to demonstrate that the Moroccan judicial

system "as a whole is so lacking in impartial tribunals or procedures compatible with due process so as to justify routine non-recognition of the foreign judgments." *Dejoria*, 804 F.3d at 382. The Court found that '[t]he Moroccan judicial system does not present an exceptional case of 'serious injustice' that renders the entire system fundamentally unfair and incompatible with due process."*Id* at 384. The Fifth Circuit also rejected DeJoria's alternative arguments that the Moroccan court lacked personal jurisdiction over him, and that Moroccan courts do not recognize Texas judgments. *Id.* at 384-387. The Court did not address DeJoria's public policy and inconvenient forum claims, however, stating in a footnote that those "arguments were not raised on appeal and are thus waived." Id. at 384 n.12. The Fifth Circuit concluded its Opinion with the boilerplate directive: "For the foregoing reasons the judgment of the district court is REVERSED and this matter is REMANDED for further proceedings consistent with this opinion." *Id.* at 389.[3] On June 20, 2016, the Supreme Court denied the petition for writ of certiorari. Dkt. No. 84.

## C. Proceedings after Remand

After remand, the case was referred to the undersigned. The parties disagreed on the scope of the Court's authority on remand to consider DeJoria's alternative arguments for non-recognition. After a delay to await the Supreme Court's decision on DeJoria's petition for writ of certiorari, the undersigned concluded that DeJoria was entitled to raise two alternative arguments that were not addressed on the merits in either the trial court or the Circuit, and on September 7, 2016, Judge Nowlin adopted the undersigned's recommendation on this issue. On September 19, 2016, Judge Nowlin transferred the case to United States District Judge Robert Pitman.

---

[3]The Fifth Circuit denied DeJoria's Petition for Rehearing and request to clarify its use of the word "waived" in footnote 12 regarding the public policy and inconvenient forum arguments. Dkt. No. 63.

The Court then set a status conference to address the logistics of disposing of the remaining issues, at which DeJoria informed the Court that he wished to seek leave to amend his complaint to add two new claims: (1) a defense to enforcement of the Moroccan judgment based on the Due Process Clause of the United States Constitution, and (2) a counterclaim to enjoin recognition and enforcement of the Moroccan judgment based on fraud. On November 30, 2016, the undersigned recommended that the District Court grant the motion to leave to add a defense to enforcement of the Moroccan judgment based on the Due Process Clause, but deny the motion for leave to add a counterclaim to enjoin recognition and enforcement of the Moroccan judgment based on fraud. On February 14, 2017, the District Court adopted the Report and Recommendation. Dkt. No. 114.

On April 23, 2017, the undersigned ordered the Parties to file briefing on DeJoria's Motion for Non-Recognition by July 31, 2017. Dkt. No. 121.[4] However, on June 1, 2017, the Texas Legislature repealed the 1981 Texas Recognition Act and enacted an updated version of the Act. *See* Uniform Foreign-Country Money Judgments Recognition Act, Act of May 22, 2017, 85th Leg., R.S., ch. 390 (codified at TEX. CIV. PRAC. & REM. CODE § 36A.001, et seq.). Because the statute had a direct impact on issues before the Court and the legislature made the statute retroactive to pending cases, the Court extended the Parties' briefing deadlines in the case.

DeJoria argues in his Motion for Non-Recognition that the Moroccan judgment should not be recognized because: (1) the Moroccan judgment falls squarely within the Amended Act's

---

[4]At this time, the issues were whether the Moroccan judgment should not be recognized because: (1) the cause of action on which the judgment is based is repugnant to the public policy of Texas under § 36.005(b)(3) of the 1981 Texas Recognition Act; (2) the Moroccan court which rendered the judgment was a seriously inconvenient forum for the trial of the case under § 36.005(b)(6) of the 1981 Texas Recognition Act, or (3) recognition of the judgment would violate DeJoria's right to due process under the Fourteenth Amendment.

provisions allowing non-recognition where the particular foreign proceedings lacked due process or where there is substantial doubt about the integrity of the rendering court with respect to the judgment; (2) the Due Process Clause of the United States Constitution prohibits enforcing the Moroccan judgment; and (3) the Moroccan judgment is repugnant to Texas public policy.

In response, MPE/MFM argue that the Court should recognize the Moroccan judgment against DeJoria because (1) Judge Nowlin's opinion is "null and void" after the Fifth Circuit reversed it and DeJoria, therefore, cannot satisfy his burden of proof by relying on it; (2) DeJoria's "integrity of the rendering court" and "specific proceeding" challenges under §§ 36A.004(c)(7) & (c)(8) fail as a matter of fact and law; (3) DeJoria's failure to participate in Morocco defeats his §§36A.004(c)(7) and (c)(8) challenges; (4) DeJoria's Due Process Clause challenge duplicates his statutory challenges and fails as a matter of fact and law; (5) the Moroccan judgment is consistent with Texas and U.S. public policy and is based on substantial evidence of DeJoria's personal involvement, fraud, and misconduct; and (6) retroactively applying the Amended Act violates the Texas Constitution.

### III. ANALYSIS

As noted, after the remand of this case by the Fifth Circuit, the Texas Legislature repealed the 1981 Texas Recognition Act and replaced it with the updated model statute produced by the National Conference of Commissioners on Uniform State Laws. The bill's sponsor stated that the bill "updates the Act based on the 2005 Uniform Foreign-Country Money Judgments Recognition Act, ensuring that Texans enjoy due process protection when defending against foreign country judgments in Texas courts." Bill Analysis, S.B. 944, 85th Leg., R.S. (March 21, 2017). The

Amended Act retained the prior statute's grounds for non-recognition, including the mandatory due process requirement, but adds the following case-specific bases for non-recognition:

> (7)     the judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment;

> (8)     the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law.

*Id.* at §§ 36A.004(c)(7) & (8).  In addition, the Amended Act now permits non-recognition when "the judgment or the cause of action on which the judgment is based is repugnant to the public policy of this state or the United States."  *Id.* at § 36A.004(c)(3).  Each of these new grounds for non-recognition are discretionary grounds.  The new amendments apply to all pending lawsuits, such as the instant case, without regard to whether the suit was commenced before or after the effective date of the Act (June 1, 2017).  TEX. CIV. PRAC. & REM. CODE § 36A.004 historical note (West 2017 Supp.) [Act of May 22, 2017, 85th Leg., § 3 (S.B. 944)].

As was the case under the previous version, the party resisting recognition of the foreign judgment—here DeJoria—has the burden of establishing a ground for nonrecognition exists. Amended Act at § 36A.004(d); *Diamond Offshore (Bermuda), Ltd. v. Haaksman*, 355 S.W.3d 842, 845 (Tex. App.–Houston [14th Dist.] 2011, pet. denied) ("Unless the judgment debtor satisfies its burden of proof by establishing one or more of the specific grounds for nonrecognition, the court is required to recognize the foreign judgment.").

## A.     Does the Amended Act's Retroactivity Clause Violate the Texas Constitution?

Section 3 of the Amended Act provides: "This Act applies to a pending suit in which the issue of recognition of a foreign-country money judgment is or has been raised without regard to whether the suit was commenced before, on, or after the effective date [June 1, 2017] of this Act."

Amended Act § 36A.004 historical note (West 2017 Supp.) [Act of May 22, 2017, 85th Leg., § 3 (S.B. 944)].  MPE/MFM argue that this section of the Amended Act violates the Texas Constitution's prohibition on retroactive laws.

### 1.     Standard of Review

"Texas courts afford state statutes a strong presumption of constitutionality under the Texas Constitution."  *Miller v. Raytheon Co.*, 716 F.3d 138, 148 (5th Cir. 2013) (citing *Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex. 2003)); *see also*, *Robinson v. Crown Cork & Seal Col., Inc.*, 335 S.W.3d 126, 146 (Tex. 2010).  Therefore, in addressing the constitutionality of a statute, courts must "begin with a presumption that it is constitutional."  *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex. 1996).  "Courts presume that the Legislature 'understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds.'"  *Id.* (quoting *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex.1968)).  The party challenging the constitutionality of a statute bears the burden of demonstrating that the enactment fails to meet constitutional requirements.  *Enron Corp.*, 922 S.W.2d at 934 (Tex. 1996).  Because of this strong presumption of constitutionality, the Texas Supreme Court has invalidated statues as prohibitively retroactive in *only four cases* – all of which involved extensions of statutes of limitations.  *See Robinson,* 335 S.W.3d at 146 (citing cases).

### 2.     Article I, Section 16 of the Texas Constitution

The Texas Constitution provides that: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."  Tex. Const. Art. I, § 16.  The constitutional prohibition on retroactive laws "protects the peoples's reasonable, settled

expectations" and "protects against abuses of legislative power." *Robinson*, 335 S.W.3d at 139. The Texas Supreme Court has defined a retroactive law as "a law that acts on things which are past." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002). "Mere retroactivity is not sufficient to invalidate a statute. . . . Most statutes operate to change existing conditions, and it is not every retroactive law that is unconstitutional." *Robinson*, 335 S.W.3d at 139 (quoting *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971)); see also, *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 55 (Tex. 2014). While there is "[n]o bright-line test" for determining whether a statute is unconstitutionally retroactive, the Texas Supreme Court has directed courts to look at three factors: (1) the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; (2) the nature of the prior right impaired by the statute; and (3) the extent of the impairment. *Robinson*, 335 S.W.3d at 145.

###### a.    Public Interest Served by the Statute

In *Robinson*, the Texas Supreme Court stated that "[t]here must be a compelling public interest to overcome the heavy presumption against retroactive laws." *Robinson*, 335 S.W.3d at 146. The legislative record in this case indicates that the Legislature enacted the Amended Act after the Fifth Circuit's decision in this case in order to protect the due process protections for Texas citizens involved in international business. The bill's sponsor in the Texas Senate explained the intent of the legislation:

> A recent federal court decision called into question whether the Texas Act protects Texans' individual due process rights by foreign court systems. S.B. 944 updates the Act based on the 2005 Uniform Foreign-Country Money Judgments Recognition Act, ensuring that Texans enjoy due process protection when defending against foreign country judgments in Texas courts.
>
> According to the Uniform Law Commission, the increase in international trade in the United States has also meant more litigation in foreign judicial systems. This means

more judgments to be enforced from country to country. There is strong need for uniformity between states with respect to the law governing foreign country money-judgments. There is also a strong public policy need to make sure basic individual protections and rights are recognized in any foreign court system that attempts to use our Texas courts to enforce their judgments on our citizens and businesses.

Unfortunately, not all foreign court systems honor basic individual and system due process protections recognized by U.S. state courts (such as the Texas state court system). The provisions of S.B. 944 ensure that Texans' individual due process rights continue to be recognized by foreign judicial systems before those foreign judgments are enforced by Texas courts.

Bill Analysis, S.B. 944, 85th Leg., R.S. (March 21, 2017). The stated purpose of the Amended Act is thus to greater protect the due process rights of Texas citizens. Obviously, protecting the due process rights of its citizens is a *compelling* public interest. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is "absolute.""); *Boddie v. Connecticut*, 401 U.S. 371, 374 (1971) ("At its core, the right to due process reflects a fundamental value in our American constitutional system.").

While MPE/MFM cannot dispute that the Amended Act serves a compelling public interest, they argue that as was the case in *Robinson*, the Amended Act was enacted only to benefit DeJoria and no one else and thus it was not in the public interest. But the facts in this case are easily distinguishable from *Robinson*. There, Barbara and John Robinson sued Crown Cork & Seal, the successor to John's former employer, alleging that John contracted mesothelioma due to asbestos exposure. 335 S.W.3d 126. After the lawsuit had proceeded to the discovery stage, the Legislature enacted Chapter 149 of the Texas Civil Practice and Remedies Code, which altered the choice of law rules in successor-liability asbestos cases. *Id.* at 130. The statute functioned to absolve Crown Cork & Seal of liability for John's mesothelioma and barred the Robinsons' claims. *Id.* at 132-33. The trial court granted summary judgment to Crown Cork & Seal based on Chapter 149's limitation of

liability. *Id.* at 133. The Robinsons appealed, arguing that Chapter 149 was a retroactive law in violation of the Texas Constitution. *Id.* Looking to whether Chapter 149 served the public interest, the Texas Supreme Court found that "the legislative record is fairly clear that chapter149 was enacted to help only Crown and no one else." *Id.* at 149. The Court emphasized that "[t]he Legislature made no findings to justify Chapter 149." *Id.* "The only public benefit achieved by the statute was the reduction of Crown Cork & Seal's liability due to asbestos litigation—a benefit we declined to find sufficiently compelling to overcome the presumption that retroactive laws are unconstitutional." *Union Carbide*, 438 S.W.3d 39 at 57. Under the second and third factors, the Court found that the legislation significantly impacted a substantial interest the Robinsons had in a well-recognized common law cause of action. *Robinson,* 335 S.W.3d at 149. Given the minimal public interest served and the grave impact on the Robinsons' right to recover, the Court held that Chapter 149 was unconstitutionally retroactive. *Id.* at 150.

In contrast to *Robinson*, the Legislature's stated purpose for adopting the Amended Act (as explained above) was to better protect Texans' due process rights with regard to the enforcement of foreign judgments. Unlike the case in *Robinson*, the Legislature did not enact the legislation to abrogate a plaintiff's common law cause of action in order to benefit one corporate party. In addition, the fact that DeJoria lobbied for the passage of the Amended Act and may have directly benefitted from that legislation does not mean that the Amended Act is not in the public interest. By the express terms of the statute, its application is not limited just to DeJoria and instead provides due process protection to all similarly situated parties.

**b.      Nature of the Rights and Extent of Their Impairment by the Statute**

Even if MPE/MFM could demonstrate that the Amended Act was not in the public interest, the other two *Robinson* factors clearly demonstrate that the Amended Act does not violate the Texas Constitution. The second and third prongs of the *Robinson* test consider "the nature of the prior right impaired by the statute," and "the extent of the impairment." *Robinson*, 335 S.W.3d at 145.

MPE/MFM have failed to identify what prior right was impaired by the Amended Act. Instead, MPE/MFM argue that the "new Act changed the controlling law and provided DeJoria with two new non-recognition grounds in §§ (c)(7) and (c)(8) and altered the § (c)(3) policy ground." Dkt. No. 129 at 50. Unlike the case in *Robinson* where the statute entirely extinguished the plaintiff's common law causes of action against the corporate defendant, the Amended Act does not eliminate any of MPE/MFM's grounds for recognition of the foreign judgment in this case. Instead, it simply provides additional grounds for non-recognition. Statutes "that do not deprive the parties of a substantive right . . . may be applied to cases pending at the time of enactment." *Univ. of Texas Sw. Med. Ctr. at Dallas v. Estate of Arancibia ex rel. Vasquez-Arancibia*, 324 S.W.3d 544, 548 (Tex. 2010); s*ee also, Robinson*, 335 S.W.3d at 146. MPE/MFM have failed to demonstrate that the Amended Act impaired any of their rights whatsoever.

Accordingly, the Court rejects MPE/MFM's contention that the Amended Act cannot be applied retroactively to this case.

**B.      Amended Act**

DeJoria devotes the majority of his briefing to argue that the Court should not recognize the Moroccan judgment based on § 36A.004(c)(8) of the Amended Act, and the Court will do the same. That section is a discretionary provision which provides that a court is not required to recognize a

foreign judgment if "the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." Amended Act at § 36A.004(c)(8). The Amended Act does not define "due process of law." However, the Comments to the 2005 Uniform Act, which the Amended Act was modeled on, explain that this subsection "allows the forum court to deny recognition to the foreign-country judgment if the court finds that the specific proceeding in the foreign court was not compatible with the requirements of *fundamental fairness*." Unif. Foreign-Country Money Judgments Recognition Act § 4 at comment 12 (emphasis added).[5] In looking at the meaning of due process of law as used in § 36.005(a)(1) of the 1981 Texas Recognition Act, the Fifth Circuit stated "the statute requires only the use of procedures compatible with the requirements of due process" and that "the foreign proceedings need not comply with the traditional rigors of American due process to meet the requirements of enforceability under the statute." *DeJoria*, 804 F.3d at 380 (quoting *Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 330 (5th Cir. 2002)). "That is, the foreign judicial system must only be 'fundamentally fair' and 'not offend against basic fairness.'" *Id.* The United States Supreme Court has repeatedly held that "[a] fair trial in a fair tribunal is a basic requirement of due process." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). In the context of foreign

---

[5]As the comments to the 2005 Uniform Act explain: "While the focus of subsection 4(b)(1) is on the foreign country's judicial system as a whole, the focus of subsection 4(c)(8) is on the particular proceeding that resulted in the specific foreign-country judgment under consideration. Thus, the difference is that between showing, for example, that there has been such a breakdown of law and order in the particular foreign country that judgments are rendered on the basis of political decisions rather than the rule of law throughout the judicial system versus a showing that for political reasons the particular party against whom the foreign-country judgment was entered was denied fundamental fairness in the particular proceedings leading to the foreign-country judgment." Unif. Foreign-Country Money Judgments Recognition Act § 4 at comment 12.

judgments, the Supreme Court has also noted that "[i]t must, however, always be kept in mind that it is the paramount duty of the court before which any suit is brought to see to it that the parties have had a fair and impartial trial." *Guyot*, 159 U.S. 113, 205 (1895); *see also*, *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1410 (9th Cir.) *cert. denied*, 516 U.S. 989 (1995).[6]

### 1. The Record

DeJoria contends that, under the new statute, the facts found by Judge Nowlin in the original proceedings make it a foregone conclusion that DeJoria has demonstrated the requirements of non-recognition under § 36A.004(c)(8) of the Amended Act. In response, MPE/MFM open their post-remand briefing by contending that "Judge Nowlin's opinion is null and void after the Fifth Circuit reversed it, and DeJoria cannot satisfy his burden of proof by relying on it." Dkt. No. 129 at 1. They further contend that the Circuit already made the relevant findings, and these findings are the law of the case and bind this Court on remand.

The problem with MPE/MFM's argument on this issue is what they do not say. If the findings Judge Nowlin originally made are "null and void," are they suggesting that completely new findings need to be made on remand? If so, they do not say this directly. Or, are they contending that no new findings are needed, because the Circuit's opinion already considered the record and made all of the relevant findings? Though at times their brief reads as if this is their position, the fact that MPE/MFM devote over half of their briefing to a discussion of the facts seems to belie this. At the end of the day, it is not at all clear what MPE/MFM are arguing with regard to the factual

---

[6]Although MPE/MFM emphasize that the foreign procedures need not comply with "the traditional rigors of American due process," they do not dispute that due process of law under the Amended Act would also require the right to a fair tribunal in the individual case itself.

record.  Given this state of affairs, it is important for the Court to state precisely what its conclusions are on this point.

First, with regard to what the  universe of evidence before the court is, the parties agreed that the record for this Court on remand would be the record that was created before Judge Nowlin.  At the status conference to address the briefing and process on remand, the Court specifically inquired whether there would be need for any additional evidence, or whether the record created during the proceedings before Judge Nowlin would remain the record on remand:

> THE COURT: The—so do I take that, then, that you don't think there's any need for any additional—anything to add to the factual record. We're fine with the factual record that the Court has.
>
> MR. ENOCH: Your Honor, we believe we are.
> [for DeJoria]

Dkt. No. 105 at 6.  For his part, Mr. Harrison (on behalf of MPE/MFM) was less direct, *id.* at 7-10, but when considered in full, his response also indicates that he believed the record that existed would remain the record on which the Court would make its findings on remand.  First, he suggested that there should be no more briefing, as the two issues that originally remained to be decided (before the change in the law) had already been briefed prior to the appeal, and the Court could simply make its decision on those briefs.  (Those briefs, of course, were based on the record created before Judge Nowlin.)  Second, when he summed up his position, he commented that, "On remand, the Court looks at the record and decides."  *Id.* at 8.

Despite this, and though they did not seek leave to submit any additional evidence on remand, MPE/MFM included a number of new exhibits with their briefing.  Some of the new material is simply legislative history related to the Texas Legislature's adoption of the Amended Act. Dkt. Nos. 129-31 to 129-38.  Some are filings or transcripts from the Fifth Circuit proceedings in

this case.  Dkt. Nos. 129-25 to 129-28; 129-54.  These are all things the Court can take judicial notice of, and are thus unremarkable.  But some of the exhibits are news articles and website information intended to demonstrate that certain entities are owned by the Moroccan royal family, as well as four judgments entered against those entities in Moroccan courts.  Dkt. Nos. 129-39 to 129-52; 129-55; 129-56; and 129-58.  MPE/MFM did not seek leave of court to supplement the record with these items, and do not even acknowledge in their briefing that these materials are not part of the record.  As a result, the Court will not consider them.[7]

### 2.  The Impact of the Reversal

Though MPE/MFM are correct that the reversal of a judgment nullifies that judgment, and makes it as if that judgment had never been rendered, that point was never in doubt.  Rather the question is, when a trial court's judgment is reversed, and the case is remanded for further proceedings, may the trial court re-adopt findings of fact made in the judgment, and if so, in what circumstances?  And to state the precise question presented *here*, when the reason the judgment was reversed is that the trial court applied the wrong legal standard, what is the status of the previously-made fact findings?  On direct appeal, the Supreme Court has relied on findings of fact made by a district court, despite finding that the court applied the wrong legal standard, suggesting that such fact findings maintain validity even when the trial court gets the law wrong.  *See, e.g., Ford Motor Co. v. EEOC,* 458 U.S. 219, 224 n.7 (1982); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783 n.10

---

[7]Consideration of the material would not have changed the outcome.  These evidence merely shows is that in the years *after* the judgment against DeJoria, Moroccan courts entered judgments in four cases against entities in which the Moroccan royal family owned an interest.  As DeJoria notes, unlike his case, these were run-of-the-mill commercial cases, with no political overtones, and no issue of the King needing to "save face."  And the largest of the judgments was approximately $750,000, while the judgment here was for over $120 million.

(1975). This conclusion is consistent with common sense, and, more importantly, with the law of the case doctrine. That doctrine provides that "an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Tollett v. City of Kemah*, 285 F.3d 357, 364 (5th Cir.), *cert. denied*, 537 U.S. 883 (2002). When a case is reversed because the wrong legal standard was applied, in most instances the fact findings are "untouched" by that ruling, because "the law of the case doctrine applies only to issues that were *actually decided*, rather than all questions in the case that might have been decided, but were not." *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001) (citation omitted) (emphasis added). So "when a judgment has come before us for review, and certain findings of fact were not examined in, relied on, or otherwise necessary to our decision in that appeal, law of the case does not prevent the trial court on remand from reexamining those findings . . . ." *See Exxon Corp. v. United States*, 931 F.2d 874, 878 (Fed. Cir. 1991).

Notwithstanding MPE/MFM's valiant attempts to characterize the decision otherwise, in reversing Judge Nowlin, the Fifth Circuit expressly concluded that he applied the wrong legal standard, and, on that basis, reversed his ruling. A simple review of both opinions makes this clear. In his order, Judge Nowlin only addressed one of DeJoria's non-recognition arguments—DeJoria's argument under § 36.005(a)(1) of the 1981 Texas Recognition Act. He began and ended his analysis with this issue, and found that the Moroccan proceedings in DeJoria's case did not provide DeJoria with adequate due process to warrant recognition of the judgment against him under § 36.005(a)(1). *DeJoria*, 38 F. Supp.3d at 811. Although Judge Nowlin at times discussed the lack of due process in the Moroccan system as a whole, his focus was on the political and economic bias that impacted DeJoria's specific case:

As a general matter, MPE/MFM's suggestion that the circumstances surrounding the case do not warrant real concerns that the King or royal family corrupted the judicial proceedings is simply not credible. *Id.* at 815

\* \* \*

[T]he likelihood that DeJoria could have or did receive a fair hearing in which the outcome was not pre-ordained is too minimal to permit the Court to overlook the serious issues with both the system and the application present in this case. *Id.* at 817

\* \* \*

Additionally, the evidence plainly shows that members of the royal family had a political and economic interest in the outcome of the underlying case. *Id.*

\* \* \*

[T]here is no conceivable set of facts or circumstances in which DeJoria could have prevailed in the underlying case. Such a proceeding is not, was not, and can never be "fundamentally fair." *Id.* at 818

\* \* \*

On appeal, MPE/MFM argued that Judge Nowlin "incorrectly evaluated the particular Morocco Court *judgment* at issue rather than properly evaluating whether 'the judgment was rendered under a *system* that does not provide impartial tribunals or procedures compatible with the requirements of due process of law,' as required under the [1981] Texas Recognition Act.'" Dkt. No. 72-1 at 2 (emphasis original). MPE/MFM further argued that Judge Nowlin ignored Fifth Circuit precedent requiring courts to focus on whether the entire country's judicial system as a whole was incompatible with due process and "erroneously applied a 'retail approach' to evaluate the 'particular judgment' at issue instead of evaluating Morocco's judicial 'system' in which the

judgment was rendered." *Id*. at p. 20.  The Fifth Circuit agreed and reversed Judge Nowlin.[8]  In doing so, the Circuit emphasized that a court's focus under § 36.005(a)(1) is on "the system as a whole:"

> The court's inquiry under Section 36.005(a)(1) focuses on the fairness of the foreign judicial system as a whole . . . .  The plain language of the Texas Recognition Act requires that the foreign judgment be "rendered [only] under a *system* that provides impartial tribunals and procedures compatible with due process."

*DeJoria*, 804 F.3d at 381 (emphasis original).  The Circuit concluded that, based on the record before it, "we cannot agree that the Moroccan judicial system lacks sufficient independence such that fair litigation in Morocco is impossible" and that "any judgment rendered by a Moroccan court is to be disregarded as a matter of course."  *Id.*  All throughout its opinion, the Circuit emphasized the distinction between a **system** lacking fundamental fairness and a single instance of a litigant being denied fundamental fairness.  Indeed, in the eight pages of opinion discussing § 36.005(a)(1), the Circuit used the word "system" no less than 36 times.  *Id.* at 377-84.  And because its focus was "on the fairness of the foreign judicial system as a whole," the Circuit specifically noted it would not "parse the particular judgment challenged."  *Id.* at 381.

The Circuit has noted that "[w]hile we recognize that 'the law of the case' doctrine comprehends things decided by necessary implication as well as those decided explicitly, it nevertheless applies only to issues that were decided and does not include determination of all questions which were within the issues of the case and which, therefore, might have been decided."  *Conkling v. Turner*, 138 F.3d 577, 587 (5th Cir. 1998) (internal quotations and citations omitted).  It does not apply to *dicta*.  18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER,

---

[8]The Fifth Circuit also rejected two of DeJoria's alternative arguments (that the Moroccan court lacked personal jurisdiction over him and that Moroccan courts do not recognize Texas judgments), which had not been reached by Judge Nowlin, and which are not at issue here.

FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2002). The Fifth Circuit clearly stated that its inquiry under § 36.005(a)(1) focused only on "the fairness of the judicial system as a whole." *DeJoria*, 804 F.3d at 382. Any discussion of whether the facts demonstrated something more or less than this, therefore, was *dicta*. *In Re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004) (relying on the BLACK'S LAW DICTIONARY's definition of *dicta*: "judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential"). Thus, the Fifth Circuit's opinion contains no "law of the case" on whether "the *specific* proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." Indeed, because § 36A.004(c)(8) of the Amended Act had yet to be enacted, and because the Fifth Circuit expressly found that 1981 Texas Recognition Act did not address due process at the case-specific level, the Circuit never addressed the question the Amended Act presents here. So unless the Circuit either expressly or implicitly rejected Judge Nowlin's findings, those findings are alive and well, and may be re-adopted on remand.

In apparent recognition of this, MPE/MFM also contend that "the Fifth Circuit weighed the evidence and disagreed with Judge Nowlin." Dkt. No. 129 at 4. In doing so, however, they grossly overstate the Circuit's findings; indeed, DeJoria's characterization of the briefing is apt: "MPE/MFM's Response takes place in an alternate reality." Dkt. No. 130 at 1. Nowhere did the Circuit state that Judge Nowlin's factual findings were erroneous or unsupported by the record; instead, they focused on the legal standard applied, stated the correct standard, and then found the facts were insufficient to meet that standard. Regardless, to hear MPE/MFM tell it, the Circuit rejected each and every one of Judge Nowlin's findings. A good example of MPE/MFM's twisting of the Circuit opinion is this statement:

- [The Circuit] [f]ound unpersuasive DeJoria's "claim[] that his life would have been endangered had he returned," and held that "DeJoria could have litigated entirely through counsel without returning to Morocco." *Id.* at 389.

Dkt. No. 129 at 6. Though only one page of the opinion is cited here, the two quoted statements come from totally different parts of the opinion. The first—that DeJoria "claimed that his life would have been endangered had he returned"—is in the very first pages of the opinion where the Circuit is reciting the facts, and there is nothing there suggesting that the Circuit found DeJoria's claim "unpersuasive." 804 F.3d at 378. The second quotation—that "DeJoria could have litigated entirely through counsel without returning to Morocco"—is found 11 pages later, in the personal jurisdiction discussion, and is merely a statement of law—that is, under Moroccan law a person is not required to be personally present to defend a case, and may appear solely through counsel. Again, there is nothing in this portion of the opinion where the Circuit challenges DeJoria's claim that he would be endangered if he traveled to Morocco. Thus, the cobbled-together quotation disingenuously makes it appear as if the Circuit reached a factual conclusion that it plainly did not. And, to make matters worse, when the entire factual record on this issue is reviewed, the evidence suggests the opposite of what MPE/MFM claim.

MPE/MFM get closer on this point when they discuss the Circuit's statements in footnote nine of its opinion. After its statement that "we cannot agree that the Moroccan judicial system lacks sufficient independence such that fair litigation in Morocco is impossible," the Circuit dropped the following footnote:

Although our inquiry focuses on Morocco's judicial system, we also observe that the record does not establish that the King actually exerted any improper influence on the Moroccan court in this case. For example, the Moroccan court (1) appointed experts, (2) took seven years to reach a decision, (3) awarded a lesser judgment than the expert recommended, and (4) absolved five defendants—including DeJoria's company Skidmore—of liability.

*DeJoria*, 804 F.3d at 382 n. 9.[9] But even this statement is plainly *dicta* and as discussed above, *dicta* is not the law of the case. 18 WRIGHT, MILLER & COOPER at § 4478. "The law of the case doctrine applies to an issue that has actually been decided, not to statements made by the court in passing, or stated as possible alternatives, or dictum." *United States v. O'Keefe*, 169 F.3d 281, 283 (5th Cir. 1999). The Fifth Circuit's "observations" about whether the King actually exerted improper influence on the Moroccan court in this case were not pertinent to the issue resolved on appeal—whether *the system as a whole* was unfair—which is likely why that observation was contained in a footnote. Because the Fifth Circuit "would have arrived at the same conclusion without the passing observation it made in footnote [9]," which "could have been deleted without seriously impairing the analytical foundations of the holding," the footnote is *dicta* and does not bind the Court on remand. *Segura*, 747 F.3d at 329. And again, because the appeal was not focused on the matters mentioned in footnote nine, it is not surprising that, while the four enumerated facts are indisputably true, there were significant deficiencies in the proceedings.

At the end of the day, the Fifth Circuit did not decide—either explicitly or by necessary implication—that the *specific proceedings* leading up to the Moroccan judgment against DeJoria were compatible with the requirements of due process of law. Thus, the law of the case doctrine

---

[9] MPE/MFM also argue that the Fifth Circuit's comment in the background section of the opinion ("[a]fter nearly seven years of considering MPE and MFM's suit, the Moroccan court ruled against DeJoria and Gustin but absolved five of their co-defendants—including Skidmore—of liability") somehow demonstrates that the Fifth Circuit ruled that DeJoria's specific proceedings did not violate due process. This statement is not even dictum but rather a mere recitation of the facts of the case.

does not prevent the Court from reexamining the fact findings that the Circuit left undisturbed, and, if appropriate, adopting them again on remand.[10]

Which brings us to the final question on this point—since there is not a legal barrier to the findings being re-adopted, *should* the Court do so? From a judicial efficiency standpoint, it of course makes sense not to revisit each and every factual finding made by Judge Nowlin. This case has been pending for almost five years. Judge Nowlin made the factual findings in this case after carefully considering the evidence submitted by the parties in this case. It would be a waste of judicial resources to reexamine all of the evidence in the case yet again. "A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and judgment. . . . A presumption against reconsideration makes sense." 18 WRIGHT, MILLER & COOPER at § 4478.1.

Similarly, the fact that the judge presiding over the case has changed does not mean the findings should change. Judge Politz explained the underlying principles well in an unpublished opinion from 2000:

---

[10]The mandate rule—which is a corollary to the law of the case doctrine—does not change the result. That rule "prohibits a district court on remand from reexamining an issue of law or fact previously decided on appeal and not resubmitted to the trial court on remand." *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006). "This prohibition covers issues decided both expressly and by necessary implication, and reflects the jurisprudential policy that once an issue is litigated and decided, 'that should be the end of the matter.'" *Id.* While a mandate controls "on all matters within its scope . . . a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal." *Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 826 (5th Cir. 1986). The Fifth Circuit's mandate contained the general remand language: "It is ordered and adjudged that the judgment of the District Court is reversed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court." See Dkt. No. 63. "Such general language suggests that the appellate court did not intend to decide a factual issue that was not within its province. . . ." *Chapman v. Nat'l Aeronautics & Space Admin.*, 736 F.2d 238, 242 (5th Cir.), *cert. denied*, 469 U.S. 1038 (1984).

The "law of the case" doctrine is a common label used to describe what is really four distinct rules. Under each of its variations, the doctrine counsels the courts to refrain from revisiting issues that have been decided in the same case. Such is the result of the "sound policy that when an issue is once litigated and decided, that should be the end of the matter." The impact given to the doctrine, however, depends on the circumstances: in some cases it is discretionary, in others it is mandatory.

When applied to decisions by judges on the same district court without an intervening appeal, the doctrine represents a rule of comity, not a limit on judicial power. Generally speaking, "when a district judge has rendered a decision in a case, and the case is later transferred to another judge, the successor should not ordinarily overrule the earlier decision." But unlike the doctrines of *stare decisis* and *res judicata*, the law of the case doctrine does not demand unwavering observance in this context. It must give way "to the interests of justice and economy when those interests are flouted by rigid adherence to the rule."

*Williams v. Bexar Cty*, 2000 WL 1029171 (5th Cir. July 14, 2000) (footnotes and citations omitted).

Here, there are no "interests of justice" or "economy" suggesting that the normal rule—that a court should "refrain from revisiting issues that have been decided in the same case"—should not apply here. Thus, it would, absent good reason, be inappropriate for this judge to reweigh the very same evidence that Judge Nowlin already weighed, merely because MPE/MFM believe that Judge Nowlin should have reached different conclusions, and credited their evidence rather than DeJoria's.

Based upon the foregoing, in deciding whether DeJoria has carried his burden under the Amended Act, the Court will rely upon facts found by Judge Nowlin, so long as those were not rejected or questioned by the Circuit. Further, because the new statute expressly adopted a new standard, the Court has also reviewed the existing record and made additional findings from that evidence that are appropriate. "Absent contrary instructions, a remand for reconsideration leaves the precise manner of reconsideration—whether on the existing record or with additional testimony or other evidence—to the sound discretion of the trial court." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1577 (Fed. Cir. 1991).

### 3.    Judge Nowlin's Findings

Judge Nowlin made the following findings relevant to whether DeJoria received due process

in the Moroccan proceedings specific to him, and the Court adopts these findings here:

> [T]the Moroccan royal family's commitment to the sort of independent judiciary necessary to uphold the rule of law has and continues to be lacking in ways that raise serious questions about whether any party that finds itself involved in a legal dispute in which the royal family has an apparent interest—be it economic or political—in the outcome of the case could ever receive a fair trial.  *DeJoria*, 38 F. Supp. 3d at 812.

* * *

> Together, the USAID report and the foreign minister's comments paint a picture of a judicial system in which judges feel tremendous pressure to render judgments that comply with the wishes of the royal family and those closely affiliated with it. *Id.* at 814.

* * *

> As a general matter, MPE/MFM's suggestion that the circumstances surrounding the case do not warrant real concerns that the King or royal family corrupted the judicial proceedings is simply not credible. *Id.* at 815.

* * *

> As for MPE/MFM's suggestion that there is no evidence that the King particularly cared about DeJoria or his role in the Talsint oil project, the evidence plainly suggests otherwise. On Monday, January 27, 2007, "Le Journal," a Moroccan daily newspaper, ran a feature story under the headline "The Talsint Oil Lie." Citing a letter sent by Skidmore Chairman (and DeJoria partner) Michael Gustin to the King and other top officials, the article "accused the King and some officials of bribery and disinformation" in regards to Skidmore's exploration and attempted production of oil in south eastern Morocco in 2000. Neither the story nor the paper would survive for very long. The next day, Le Journal suddenly retracted the story, stating (without any meaningful explanation) that everything they had published was untrue. The paper also announced—again without any explanation—that it would voluntarily go out of circulation for an undisclosed period of time. Two days later, a sister publication reported that the author of the "offensive" Le Journal article (who also served as Le Journal's editor-in-chief) and Le Journal's publisher were both compelled to appear at the Justice Center so that they could be interrogated by criminal prosecutors about their involvement with the story. *Id.* (internal citations omitted)

* * *

Given the narrative power that [a] verdict [against them] would undoubtedly have, MPE/MFM's suggestion that a man who cared enough about maintaining his image to intimidate and prosecute a whole paper into submission had no interest in the outcome of a case which could either re-enforce his favored image or, alternatively, make him appear foolish if not downright dishonest for having promised so much oil during his now infamous speech simply does not add up.

These facts would have been readily apparent to any judge presiding over this case. Given the King's history of retaliation, not only against judges who displease him but against anyone who threatens his narrative relating to his involvement in Talsint, the Court cannot conceive of any set of circumstances in which the presiding judge in the underlying case would not have felt tremendous pressure to side with MPE/MFM.

\* \* \*

The King's behavior suggests a strong preference that DeJoria be portrayed as a fraudster who misled the King (since, if DeJoria did not, the King appears dishonest, incompetent, or both in retrospect). Whether or not the King, Prince, or some other official picked up the phone and ordered the judge to find against DeJoria is, in some sense, beside the point. Even if no such phone call was ever made, the Court nevertheless cannot, in good conscience, conclude that Morocco provided Mr. DeJoria with adequate due process to warrant enforcement in this country.

\* \* \*

[T]he likelihood that DeJoria could have or did receive a fair hearing in which the outcome was not pre-ordained is too minimal to permit the Court to overlook the serious issues with both the system and the application present in this case. *Id.* at 816-817.

\* \* \*

Here, there is extensive evidence suggesting that Morocco's judiciary is dominated by the royal family (through no fault of the judiciary, which would prefer to be left alone to do its job). Additionally, the evidence plainly shows that members of the royal family had a political and economic interest in the outcome of the underlying case. This is a deadly combination, for the confluence of circumstances makes it highly likely that the royal family impacted the judicial oversight of a proceeding in which they themselves had an interest. *Id.* at 817.

\* \* \*

"[A] common sense reading of the evidence" in this case unequivocally supports the conclusion that John Paul DeJoria could not have been expected to obtain a fair hearing in Morocco had he attempted to fight the charges against him. While the evidence plainly suggests that Morocco's judges wish to obtain the freedom from pressure

necessary to impartially conduct the business of the court system, the evidence also reveals that any judge presiding over DeJoria's case would have had to ignore either an explicit or implicit threat to his career—if not to his safety and well-being—in order to find against MPE/MFM. Absent an act of tremendous bravery by the judge, there is no conceivable set of facts or circumstances in which DeJoria could have prevailed in the underlying case. Such a proceeding is not, was not, and can never be "fundamentally fair." *Id.* at 817-18.

### 4. Additional Factual Findings

In addition to Judge Nowlin's factual findings, the record in this case contains the following evidence showing that DeJoria was denied due process in this case.

### a. DeJoria's Ability to Attend the Proceedings

DeJoria contends that he was unable to personally appear at any of the court proceedings, as he had a legitimate fear that either his safety or liberty would be at risk had he traveled to Morocco once the dispute leading to the lawsuit arose. MPE/MFM contend that DeJoria has exaggerated the threat, and also suggest that the Fifth Circuit has effectively rejected this argument. Dkt. No. 129 at 18-19. On the latter point, and as they do throughout their brief, MPE/MFM have significantly overstated what the Circuit opinion says. The section of the opinion they quote from is addressing DeJoria's personal jurisdiction argument and DeJoria's contacts with Morocco, and, moreover, is looking at those contacts *before* the dispute arose. It says nothing about whether the Fifth Circuit found DeJoria's concern for his safety credible. The only record evidence that MPE/MFM offer to controvert DeJoria's claim comes from their retained expert's affidavit, dated in 2013—a dozen years after the relevant events—in which he brushes off Gustin and DeJoria's fear as a simple "poor understanding of Morocco." Dkt. No. 37-1 at ¶ 54. But it is clear that DeJoria was not basing his fear on some sort of misunderstanding, but instead on a specific death threat delivered to his business partner. As Mr. Gustin explained:

On May 22, 2001, after having received a death threat in connection with Lone Star's activities in Morocco, at a meeting of Lone Star's Board of Directors, I resigned as Lone Star's President/CEO and Chairman as a result of the death threat. I cannot reveal details of this threat without compromising the safety of innocent people still in Morocco. . . . I left the Board meeting in progress in Rabat, Morocco for the reason that I no longer felt secure as to my personal safety if I remained in Morocco and/or in my two executive positions with Lone Star. I left Morocco on May 23, 2001, and I have never been back to Morocco since that time.

Dkt. No. 30-19 at ¶ 7. He further explained that "I told Mr. DeJoria that I understood the threat to be directed at Mr. DeJoria, as well as at me, and that I believed it was unsafe for either me or Mr. DeJoria to return to Morocco." *Id.* at ¶ 8. DeJoria testified that immediately following the board meeting, Gustin informed him of the threat, "and on many occasions thereafter, he related to me the facts of the death threat and his concern for our personal safety should either of us ever return to Morocco." Dkt. No. 30-11 at ¶ 6. DeJoria's own understanding, from this information, was that it would not be safe for him to attend the court proceedings in Morocco. *Id.*

And though MPE/MFM's paid expert belittled these fears, third party attorneys who practiced or resided in Morocco, and who addressed these issues during the relevant time frame, found the fears credible. A French attorney, licensed to practice in Morocco, who was approached in 2005 by Gustin on behalf of Skidmore to represent them, advised that "[c]learly it is . . . unsafe for Mr GUSTIN and Mr DEJORJA to go to Morocco in a case involving his Highness Prince Moulay Abdellah Alaoui, a first cousin of his Majesty King Mohammed VI, King of Morocco, and his partners." Dkt. No. 30-19 at 43. He described the risks to their welfare as "unacceptable," and he did "not think it prudent, safe, or wise for any sane person to go there for any reason concerning this case." *Id.* Further, a Norwegian attorney, licensed in France and located in Paris, who had represented Skidmore in a matter before the ICC Arbitration Court, assisted Skidmore in 2007 in locating a Moroccan attorney to review documents in the case. He testified that the Moroccan

29

attorney "repeatedly advised the defendant parties not to enter Morocco," and "pointedly advised and warned on more than one occasion that any appearance by Skidmore or any personal representative of Skidmore in the Moroccan lawsuit would be dangerous." Dkt. No. 42-10 at 3-4.[11]

Weighing all of this evidence, the Court concludes that DeJoria's fear of traveling to Morocco was credible, and that the fear arose not from a general danger of traveling in Morocco, but rather from this specific litigation, and the political and other interests of the Moroccan royal family in the litigation. Moreover, Mr. Kabbaj's vague after-the-fact discounting of those fears fails to counter DeJoria's evidence, and indeed, it does not even attempt to directly rebut the far more specific evidence DeJoria offers. Thus, the Court finds that in the circumstances of this particular case, DeJoria was unable to personally appear to defend himself and offer testimony to rebut the claims made against him in the Moroccan lawsuit.

### b. DeJoria's Abiliy to Retain Counsel

The parties hotly contest whether the political nature of DeJoria's case, and the King's political interest in the underlying oil exploration project and in the case itself, prevented DeJoria from being able to obtain legal counsel in the Moroccan proceedings. The Circuit did not address the issue specific to DeJoria, though it noted that one of DeJoria's co-defendant's "did briefly retain Moroccan attorney Azzedine Kettani until a conflict of interest forced his withdrawal." *DeJoria*, 804 F.3d at 383. It also noted that MPE/MFM's expert Mr. Kabbaj "opined that it is 'not at all uncommon' for Moroccan attorneys to represent unpopular figures in Moroccan courts." *Id.* This

---

[11]This attorney—Amina Ben Brik—is a bit of an enigma, as the record reflects that she may have actually represented MFM in this very litigation at one time, though the Norwegian attorney testified that he hired her on behalf of Skidmore for the limited purpose of reviewing documents. About the only thing that is clear about her role in this case is that her role is unclear. She is discussed in more detail in the next section.

was, of course, a general statement, and said nothing about whether DeJoria himself was able to find an attorney to represent him in Morocco.[12]

A review of the record leads the Court to conclude that DeJoria was in fact unable to retain counsel to represent him, and again, this was due to the fact that he was a defendant in a case that was of great political interest to the King of Morocco, and his interests were adverse to the King's. First, the only testimony MPE/MFM offer to directly address this point (again, from their retained expert, Moroccan attorney Azeddine Kabbaj) does not identify any Moroccan attorney that actually was willing to represent DeJoria in the case. Kabbaj only makes conclusory statements such as "it is not at all uncommon for Moroccan attorneys to represent unpopular figures in Moroccan courts." And though he claims that "there are many attorneys in Morocco who would have been willing to represent DeJoria," he notably fails to identify a single one, nor does he even indicate that *he* would have represented DeJoria had he been approached. DeJoria's evidence was more specific. DeJoria explained that Gustin contacted Bernard Dessaix, a French attorney licensed to practice in Morocco, about representing their interests in the case. Dkt. No. 30-11 at ¶ 13. After "multiple phone conferences and letters" Dessaix declined representation, *id.*, and explained the risks an attorney would face if he or she represented Skidmore, DeJoria or the other defendants in the case:

> Clearly it is not only unsafe for Mr GUSTIN and Mr DEJORJA to go to Morocco in a case involving his Highness Prince Moulay Abdellah Alaoui, a first cousin of his Majesty King Mohammed VI, King of Morocco, and his partners, but it is also unsafe

---

[12]MPE/MFM claim that the Fifth Circuit resolved this issue completely, because the Circuit noted that under Moroccan law, "DeJoria could have litigated entirely through counsel without returning to Morocco." Dkt. No. 129 at 15. As already noted in the text, this comment was made in the section of the opinion discussing personal jurisdiction, and is merely a statement of law—that is, under Moroccan law a person is not required to be personally present to defend a case, and he may appear solely through counsel. The Circuit quite clearly did *not* find there were Moroccan attorneys willing to represent DeJoria in this case.

and unwise for any lawyer/barrister from any country to go there and plead against his Highness Prince Moulay Abdallah Alaoui and his partners to argue that anyone descending from the Prophet Mohammed did not keep his word.

The potential risks to one's welfare are unacceptable

Dkt. No. 30-19 at 43.

The record also reflects that in the early days of Skidmore and DeJoria's involvement in the Moroccan oil exploration project, Gustin hired the Moroccan attorney Azzedine Kettani to assist with "reviewing Lone Star's documents and forms of agreements." Dkt. No. 30-19 at ¶ 10. MPE/MFM point to this to argue that Moroccan attorneys were available to, and willing to work for, DeJoria in the litigation. First, this work was done before the dispute arose. And further, by the middle of 2001, after the dispute arose, but before the lawsuit was filed, Mr. Kettani withdrew from any future representation of Lone Star or Skidmore because MFM had attempted to engage another attorney in the firm—Nadia Kettani—who was apparently unaware of the firm's previous representation of Skidmore. When the potential conflict came to light, Azzedine Kettani informed MFM that his firm could not represent it as it already had an ongoing relationship with Skidmore. Dkt. No. 37-20 at 6. MFM, through counsel, demanded that Kettani withdraw from representing Skidmore as well, and Kettani quickly relented. *Id.* at 4, 5.[13] Thus, this firm—which MPE/MFM describe as "Morocco's largest independent law firm"—was no longer available to represent DeJoria.

Next, there is the situation with the mysterious Amina Ben Brik. MPE/MFM assert that Ms. Ben Brik represented Skidmore in the Moroccan proceedings, relying on two letters, written in Arabic, and translated into English. The first letter purports to be a notice to the court that she

---

[13]DeJoria complains that this was an engineered conflict of interest, intended to conflict out of the case the one Moroccan attorney he could find to represent him. Though this may have been true, there is not enough evidence in the record for the Court to reach that conclusion.

represented Skidmore, and requested approval to copy documents from the file. Dkt. No. 37-23 at 2-4. The second letter, dated nearly a year later, is more cryptic, and is addressed to the expert, and also refers to her "client Skidmore Energy." There is, however, no evidence of what, other than send these letters, Ben Brik did in the case, and, from the record as a whole, it is less than clear who she was representing in the little involvement she had. As DeJoria points out, the final expert refers in his report to her being counsel for MPE. Dkt. No. 37-22 at 5. And the Moroccan judgment lends further confusion, suggesting Ben Brik represented *both* MPE and Skidmore. Dkt. No. 6-2 at 13. The most clarity regarding her role comes from the Norwegian attorney who appears to have retained her, on behalf of Skidmore (not DeJoria), who testified that she was hired for the limited purpose of trying to gain access to the court file, and to observe proceedings. She was never hired to represent Skidmore in any other capacity. Dkt. No. 42-10 at 3. Further, the Norwegian attorney reported that Ben Brik specifically warned that "any appearance by Skidmore or any personal representative of Skidmore in the Moroccan lawsuit would be dangerous," which may explain why the judges and experts in Morocco were never quite clear on who her client was, as she herself may not have wanted to make that clear. *Id.* at 4.

MPE/MFM also point to correspondence in the file between Skidmore's general counsel and Moroccan attorney Hammadi Manni as evidence that Moroccan attorneys were willing to represent Skidmore and the defendants. Dkt. No. 129 at 17. But those letters suggest nothing more than that Skidmore asked Manni to indicate the terms on which he would represent Skidmore, and then followed up in another letter indicating that it "look[ed] forward to your reply." Dkt. No. 37-23 at 9-14. The record contains no other evidence regarding any communication with Manni, and thus no indication that Manni ever responded to the letters, or if so what he said. And the record *is* clear

that Manni never made an appearance for Skidmore, so this evidence actually supports the inference that Manni ultimately was not willing to appear on Skidmore's behalf.

Finally, MPE/MFM note that the American law firm Baker & McKenzie, which has an office in Morocco, represented DeJoria in *this* case, and suggests from the fact its Moroccan offices are still open and no attorneys there have suffered reprisals, that the King must not be too upset about this matter. But as DeJoria notes, this does not prove that in 2002, when the case against DeJoria was filed, and shortly after the death threat was delivered, DeJoria could have retained a Moroccan attorney. Baker & McKenzie opened its small Casablanca office in late 2012, more than two years *after* the judgment against DeJoria was entered, and eleven years after DeJoria needed Moroccan counsel. At best, the fact that Baker & McKenzie—a firm with more than 5,000 attorneys in 44 countries , only two of whom are permanently resident in the Casablanca office—was for a time part of the team that has represented DeJoria in this proceeding, indicates only that if any pressure was placed on Baker & McKenzie to decline the representation here in the U.S., it was not sufficient to lead to it to do so. Further, it is difficult to know what to make of MPE/MFM's new evidence showing that Baker & McKenzie's Paris and Casablanca offices advised Societé Nacionale d'Investissement in a large M&A transaction in 2016 (MPE/MFM describe SNI as a multi-billion dollar company controlled by the Moroccan royal family). While one inference that might be drawn from this is that, at least in 2016, the King of Morocco was not inclined to punish a law firm representing DeJoria in this case, another inference might be that the King and royal family are pragmatic, and in 2016, more than 15 years after the events underlying the dispute with Skidmore and DeJoria, they found it worth their while to have Baker & McKenzie represent one of their companies in a large international merger from which they stood to benefit greatly, *even though* the

royal family was upset that the firm had also represented DeJoria in this case. Whatever the case, the evidence simply does not show anything about DeJoria's ability to find an attorney willing to represent him in Morocco when it mattered—in 2001 and the few years thereafter.

Again, weighing all the evidence before it, the Court concludes that DeJoria was in fact unable to retain counsel to represent him during the time the Moroccan case was active, and again, this was due to the fact that he was a defendant in a case that was of great political interest to the King of Morocco, and his interests were adverse to the King's. In reaching this conclusion, the Court has taken into account not only that which is set out above, but also that numerous Moroccan attorneys warned DeJoria or his partners of the personal risks they faced if they returned to Morocco, and that an attorney could face if he represented them, that DeJoria had substantial resources with which to hire an attorney and yet nevertheless no attorney made an appearance for him, and finally, that direct evidence of the King's feelings with regard to those who took up DeJoria's side of things was demonstrated in his shutting down a newspaper that dared to suggest that perhaps MPE/MFM's narrative of the events with Skidmore, et al. was incorrect (as Judge Nowlin detailed in his findings).[14]

---

[14]MPE/MFM argue that even if the underlying proceedings suffered from all of these defects, DeJoria waived any complaint he might have because he did not file an appeal, which would have led to a de novo review of the case. The problem with this argument is that it assumes DeJoria could have retained an attorney to file the appeal, and participate in the de novo review. As already found, that was not the case. So this is not like the cases MPE/MFM cite, where the party who was contesting recognition of a judgment was not prevented from participating in their appeal, but instead simply chose to stop fighting in the foreign country, and to bring their fight back to the U.S. Here, DeJoria was denied the ability to fight the case in Morocco at trial or on appeal.

### c.     The Independence of the Experts

Lastly, the evidence in the record shows that the Moroccan court was determined to award damages against DeJoria, even when the very experts the court retained advised otherwise. Specifically, the Moroccan court record indicates that over the seven years that the case remained pending, the court retained five experts to advise the court on whether any damages had been suffered as a result of the defendants' allegedly wrongful acts.  After reciting in detail that experts were engaged to "determine the value of the damages and losses that may have been incurred by the Claimants as a result of the Defendants' actions," the judgment notes that reports were submitted by three experts—Saleh Al-Ghazouli, Al-Saadiya Fatthi, and Mohamed Al-Karimi.  Dkt. No. 6-2 at 11. These three experts, according to the judgment "concluded that they could not provide any firm opinion on the matter."  *Id.* at 13.  So, rather than entering judgment that the claimants take nothing, the court "ordered a new assessment and assigned the task to expert Saad Al-Omani."  *Id.*  And what was this expert's assessment?  We do not know, because the judgment states, without explanation, that he was too was replaced, this time by Ahmed A-Khardal, the fifth expert to be engaged by the court.  Khardal submitted his report on January 22, 2009, and was the first of the experts to conclude that there were damages incurred.  This time, there was no dismissal of the expert, and by the end of 2009, the Moroccan court entered judgment against Gustin and DeJoria for 98% of the damages Khardal recommended.  *Id.*

MPE/MFM attempt to discount all of this, through their retained expert Kabbaj, and American lawyer and adjunct law professor Abed Awad.  The majority of the experts' testimony on these issues does not address the precise point before the Court, but instead discusses non-controversial issues such as it being common for legal systems like Morocco's to retain experts for

the purposes for which the experts were retained in DeJoria's case. Further, their testimony discusses the procedural protections parties have in Morocco with regard to experts, such as the right to nominate or object to experts. Such procedural protections were of little value to DeJoria, however, given the Court's conclusion that DeJoria could not appear or retain counsel to represent him in the case; regardless, they say nothing about whether what happened in *this* case was fair. Further, MPE/MFM not very subtly suggest that the first three experts may have been dismissed because they failed to do any work in the case, or failed to do it timely. Dkt. No. 129 at 26 (quoting Kabbaj's testimony that "[i]f the expert does not turn in his report within the time frame set by the commercial court judge or if the expert does not accept the assignment, then the commercial court judge usually will appoint another expert and inform the parties accordingly."). But there is no need to speculate about why the experts were dismissed, because the judgment says what happened—the three experts "concluded that they could not provide any firm opinion on the matter." Dkt. No. 6-2 at 13. That is a gentle way of saying the three experts could not recommend that *any* damages be awarded. And MPE/MFM's claim that the fourth expert was dismissed because he was ill has no factual basis, other than the bald statement contained in Awad's affidavit that "at least one of [the experts] became ill and was replaced." Dkt. No. 37-2 at 18 ¶ 48(l). Awad offers no explanation of where that information comes from. The judgment—which is far more credible evidence—says only that after the first three experts were unable to recommend any damages, "the court ordered a new assessment and assigned the task to expert Saad Al-Omani, who was subsequently replaced by expert Ahmed A-Khardal." Dkt. No. 6-2 at 13.

In isolation, this history may not be troubling. But when taken in conjunction with the other evidence—the King's intense interest in the case, the death threat, the recommendation of Moroccan

attorneys that DeJoria stay out of Morocco, the unwillingness of attorneys to represent DeJoria, the closing of the newspaper that reported on the energy project in a manner unfavorable to the King and the threatening of the paper's editor and publisher with criminal charges—the sequence of events with regard to the experts takes on far more significance, and is yet one more piece of evidence leading the Court to conclude that the specific proceedings in the Moroccan court leading to the judgment against DeJoria were not compatible with due process. Thus, while MPE/MFM point to the existence of experts, the seven-year tenure of the case, the exoneration of the defunct corporate entities, and the two percent reduction in the final expert's damage calculation as evidence that DeJoria received due process, this would appear to be more spin than fact. Instead, the number of experts engaged, and the length of time the case was pending appears to be evidence of the difficulty the commercial court judges had in coming up with a colorable basis on which to impose liability on Gustin and DeJoria, and the struggle they had finding an expert to support an award of damages.

5.    **Conclusions**

Based upon the findings made by Judge Nowlin, and those made herein, the Court finds that DeJoria has presented sufficient evidence to demonstrate that "the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." Amended Act § 36A.004(c)(8). The facts demonstrate that DeJoria was denied an impartial tribunal because the royal family had a clear political interest in the outcome of the underlying case which "was not compatible with the requirements of due process of law." The Comments to the 2005 Uniform Act provide that non-recognition will be satisfied by "a showing that *for political reasons* the particular party against whom the foreign-country judgment was entered was denied fundamental fairness in the particular proceedings leading to the foreign-country judgment." § 4 cmt. ¶ 12

38

(emphasis added.)  This is the situation in the case at bar.  The failed oil exploration project was a significant political embarrassment for the King.  This in turn led to a death threat being lodged against DeJoria and him having to remain outside of Morocco, to him being unable to find an attorney willing to represent him in the dispute, and thus to MPE/MFM being completely unopposed in their suit.  Despite the lack of opposition, the court struggled to find an expert who would certify the award of any damages, but the Court doggedly persisted until such an expert was located, and once located, awarded 98% of what he recommended.  The ability to appear, either in person or through counsel, is a fundamental requirement of due process, as is a fair tribunal that acts independently of political influence.  All of that was lacking here. Section (c)(8) presents a discretionary ground for non-recognition, and, as Judge Nowlin found in the initial proceedings, the Court once again believes that the proper exercise of its discretion in this case is to grant the motion for non-recognition.[15]

## IV.   RECOMMENDATION

The undersigned **RECOMMENDS** that the District Court **GRANT** John Paul DeJoria's Motion For Non-Recognition under § 36A.004(c)(8) of the Texas Uniform Foreign-Country Money Judgments Recognition Act (Dkt. No. 128).

---

[15]DeJoria also requests non-recognition based on § 36A.004(c)(7) of the Amended Act, which applies to cases that "raise substantial doubt about the integrity of the rendering court with respect to the judgment."  Given the findings regarding the pressures on Moroccan judges in cases involving political issues impacting the King, as well as the findings on there being musical chair experts, there may be sufficient evidence to support a (c)(7) finding.  But because the finding under (c)(8) is stronger, and sufficient in its own right to support this outcome, the Court will not reach that issue. Likewise, for the same reason,  the Court need not reach the public policy argument under (c)(3), nor decide whether there is an independent Due Process right to non-recognition, and if that argument is subsumed within the terms of subsection (c)(8) of the Amended Act.

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 26th day of February, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE